JUSTICE RICE,
dissenting.
¶47 Every judicial officer who has considered the subject statute has recognized the ambiguity inherent in the Legislature’s employment of the term “combined appropriation” in this context. Addressing the ambiguity, the District Court considered legislative history, purposes of the iterations of the statute, water law commentaries, and the administrative record. The DNRC Hearing Examiner did the same and upheld the challenged administrative rule, concluding that “the most common definition [] of ‘combined’ is physically joined together. Therefore, the ‘physically manifold’ requirement under the administrative rule is not inconsistent or in conflict with the plain language of the statute, and certainly not plainly and palpably inconsistent with the statutory language.” These analyses turned to interpretational guides because “[w]hen the legislative intent cannot be readily derived from the plain language, we review the legislative history and abide by the intentions reflected therein.” Montanans for Justice v. State, 2006 MT 277, ¶ 60, 334 Mont. 237, 146 P.3d 759 (emphasis added). Everyone who has considered the statute—except the Court—has agreed: the subject statute is not clear and legislative intent cannot be “readily derived.” However, the Court sweeps away the messy business of considering and analyzing the legislative record and history, preferring instead to employ the ipse dixit canon of statutory construction: the statute is absolutely clear on its face because we say so.
*521 ¶48 Perhaps the reason for this is found in ¶ 13 of the Opinion. While this case is about the validity of an administrative rule, the Court is alarmed about the policy ramifications of the rule: that exempt appropriations “have grown steadily” and are “consuming significant amounts of water”; that it is anticipated that “appropriations will continue to grow rapidly”; that exempt appropriations will be added in “already over-appropriated basins”; that there are concerns that the “cumulative effects of these exempt appropriations are having a significant impact” on groundwater and surface flow levels; and that these appropriations “may be harming senior water users’ existing rights.” While it is always tempting to act decisively in response to a perceived policy problem, and to legislate a solution, legislating is neither our duty nor our prerogative. By deciding to solve the problem by simply declaring that the statute is unambiguous, and thus avoid the trouble of considering the troublesome history, the Court is holding that the DNRC inexplicably misinterpreted and misapplied a clear statute for the past 23 years, despite the fact the agency undertook rulemaking in 1993 for the very purpose of more accurately applying the statute and removing ambiguity in the former rule. Nobody has argued or even hinted at such a proposition, because nobody believes it.
¶49 The Well Drillers argue that “combined appropriation” plainly denotes a “physical connection” between two or more groundwater developments. The Coalition counters that “combined appropriation” clearly refers to groundwater developments that are used together for a “single beneficial use.” The statute simply does not explain what level of commonality between two or more groundwater developments is required before water withdrawn from the developments can fairly be said to be in “a state of unity”—as the word “combined” is defined in The American Heritage Dictionary of the English Language 368 (Joseph P. Pickett ed., 5th ed. 2011)—for purposes of the statute. The term “combined appropriation” could reasonably be understood, as the Well Drillers argue, to signify physical unity. Likewise, the term could reasonably be understood, as the Coalition argues, to signify only unity of use.
¶50 Accepting the reality that the statute is ambiguous, I would decide the case by employing the applicable canons of statutory construction. In the context of an ambiguous statute that has been subject to a longstanding interpretation by administrative rule, we apply the canon of deference to the agency’s interpretation. Mont. Trout Unlimited v. Mont. Dep’t of Natural Res. & Conservation, 2006 MT 72, ¶ 37, 331 Mont. 483, 133 P.3d 224. “[I]t is a well-accepted rule of statutory *522 construction that the long and continued contemporaneous and practical interpretation of a statute by the executive officers charged with its administration and enforcement constitutes an invaluable aid in determining the meaning of a doubtful statute.” Mont. Power Co. v. Mont. PSC, 2001 MT 102, ¶ 24, 305 Mont. 260, 26 P.3d 91 (internal quotations omitted) (citing Bartels v. Miles City, 145 Mont. 116, 122, 399 P.2d 768, 771 (1965)); accord Molnar v. Fox, 2013 MT 132, ¶ 27, 370 Mont. 238, 301 P.3d 824. When the interpretation has “stood unchallenged for a considerable length of time,” it will be regarded as a “great importance in arriving at the proper construction of a statute.” Mont. Power Co., ¶ 24 (emphasis added) (quoting Bartels, 145 Mont. at 122, 399 P.2d at 771); accord Mont. Trout Unlimited, ¶ 37. Deference to the agency’s interpretation is a form of estoppel, borne from the reliance by the “public and those having an interest in the interpretation of the law.” Mont. Power Co., ¶ 24 (quoting Bartels, 145 Mont. at 122, 399 P.2d at 771); accord D’Ewart v. Niebauer, 228 Mont. 335, 340, 742 P.2d 1015, 1018 (1987).
¶51 This canon of deference is to apply “where the particular meaning of a statute has been placed in doubt, and where a particular meaning has been ascribed to a statute by an agency through a long and continued course of consistent interpretation, resulting in an identifiable reliance.” Mont. Power Co., ¶ 25 (emphasis added). The canon of deference to an agency’s interpretation, rising to one of “great importance” when the interpretation is longstanding, yields only upon “compelling indications” that the construction is wrong. Mont. Power Co., ¶¶ 23-25.
¶52 Whether an agency’s interpretation of a statute is “longstanding” is not subject to a bright line test, but this case does not present a close call. The 1993 administrative rule has been the law for 23 years now, which is more than sufficient time to be considered “a long and continued course of consistent interpretation.” Mont. Power Co., ¶ 25. For the same reason that a one-year-old administrative rule is clearly not “longstanding,” Mont. Trout Unlimited, ¶ 38, a two-c/eeac/e-old administrative rule clearly is. Thus, unless there are “compelling indications” that DNRC’s interpretation of the subject statute is wrong, the Court should defer to DNRC’s interpretation of “combined appropriation.” Mont. Power Co., ¶¶ 23, 25.
¶53 The genesis of this dispute is the agency’s 1993 rulemaking, which, as explained by the Hearing Examiner, was undertaken to more concisely define the statutory term “combined appropriation,” and to remove ambiguity from the previous rule that rendered the statute “difficult to administer.” In the many years that followed, review of the *523 1993 rule was undertaken by legislative committees, but no objection was made and no action was taken to alter the rule. This inaction corresponds to the purpose of the canon of construction mentioned above: the Legislature can act at any time it believes a rule is improper. Here, minor amendments were made to the statute over the years, but those did not involve the use of the term “combined appropriation.” However, that changed in 2013, when the Legislature revisited the term.
¶54 Senate Bill 19, discussed below, and Senate Bill 346 were passed during the 2013 Legislative Session. Senate Bill 346 was entitled “An Act Generally Revising Water Laws Related to Ground Water Appropriations Exempt From Permitting.” 2013 Mont. Laws 1796. Prior to the passage of Senate Bill 346, the relevant portion of the statute provided:
(3)(a)(i) Except as provided in subsection (3)(a)(ii), outside the boundaries of a controlled ground water area, a permit is not required before appropriating ground water by means of a well or developed spring:
(A) with a maximum appropriation of 35 gallons a minute or less, not to exceed 10 acre-feet a year, except that a combined appropriation from the same source from two or more wells or developed springs exceeding this limitation requires a permit;
Section 85-2-306(3)(a)(i)(A), MCA (2011). Senate Bill 346 made the following revisions to § 85-2-306, MCA, as indicated in the session law:[1]
(3)(a)(i) Except as provided in subsection (3)(a)(ii), outside Outside the boundaries of a controlled ground water area, a permit is not required before appropriating ground water by means of a well or developed spring:
(A) with a maximum appropriation of 35 gallons a minute or less, not to exceed 10 acre feet a year, except that a combined appropriation from the same source from two or more wells or developed springs exceeding this limitation requires a permit; or fB)(i) when the appropriation is made by a local governmental fire agency organized under Title 7, chapter 33, and the appropriation is used only for emergency fire protection, which may include enclosed storages

(ii) when a maximum appropriation of350gallons a minute or less is used in nonconsumptive geothermal heating or cooling exchange 
*524
applications, all of the water extracted is returned without delay to the same source aquifer, and the distance between the extraction well and both the nearest existing well and the hydraulically connected surface waters is more than twice the distance between the extraction well and the injection well;

(Hi) when the appropriation is outside a stream depletion zone, is 35 gallons a minute or less, and does not exceed 10 acre-feet a year, except that a combined appropriation from the same source by two or more wells or developed springs exceeding 10 acre-feet, regardless of the flow rate, requires a permit; or (iv) when the appropriation is within a stream depletion zone, is 20 gallons a minute or less, and does not exceed 2 acre-feet a year, except that a combined appropriation from the same source by two or more wells or developed springs exceeding this limitation requires a permit.

(ii) Outside the boundaries of a controlled ground water area, a permit it not required before appropriating ground water by means—of a—weR—or—developed—spring—with—a—maximum appropriation of 350 gallons a minute or less for—use in nonconsumptive—geothermal—heating—or—cooling—exchange applications if all of the water extracted is returned without delay to the same source aquifer and if the distance between the extraction well and both the nearest existing well and the hydraulically connected surface waters is more than twice the distance between the extraction well and the injection well.
2013 Mont. Laws at 1799-800.
¶55 As part of its expressed intention to generally revise ground water appropriation laws, the 2013 Legislature expanded the use and purpose of the term, “combined appropriation.” Whereas the term was used only once in pre-2013 law, the term was further employed in entirely new subsections that incorporated the concept of “stream depletion zones.” As argued by the Well Drillers, “with the creation of § 85-2-306(3)(a)(iv), MCA, in 2013 and the inclusion of ‘combined appropriation’ language, it can very well be presumed that pursuant to Grenz [v. Mont. Dep’t of Natural Res. & Conservation, 2011 MT 17, ¶ 41, 359 Mont. 154, 248 P.3d 785], the legislative intent included the use of the 1993 Rule’s definition of the exempt well statute.” This is correct: when the 2013 Legislature generally revised the statute, the applicable administrative rule was the agency’s longstanding 1993 rule, which did not require physical connection between groundwater developments. By then, the 1993 rule had been in place for 20 years, and in accordance with the applicable canon of construction, “a *525 particular meaning [had] been ascribed to [the] statute by an agency through a long and continued course of consistent interpretation, resulting in an identifiable reliance.” Mont. Power Co., ¶ 25. Thus, the 2013 Legislature, proceeding upon that “identifiable reliance,” affirmatively employed the longstanding, 20-year agency interpretation of the statute.
¶56 The Court cites § 1-2-203, MCA, which provides that when a statute is amended, “the portions which are not altered are to be considered as having been the law from the time they were enacted, and the new provisions are to be considered as having been enacted at the time of the amendment.” The Court concludes that the 2013 general revision to the statute is an amendment that contains no “new” provisions. However, I would conclude Senate Bill 346’s title, new language, and new structure demonstrate that, more than a mere amendment, a general revision was intended and enacted that incorporated the longstanding agency interpretation.
¶57 Canons of construction can be contradictory, and the particular canon that governs the interpretation of a given statute depends on the context. See, e.g., State v. Liefert, 2002 MT 48, ¶ 26, 309 Mont. 19, 43 P.3d 329 (ambiguous criminal statutes to be interpreted in favor of defendant); Eisenmenger v. Ethicon, Inc., 264 Mont. 393, 400, 871 P.2d 1313, 1317 (1994) (ambiguous statute of limitations to be interpreted to allow the longer period in which to prosecute the action); Mont. Bankers Ass’n v. Mont. Dep’t of Revenue, 177 Mont. 112, 117, 580 P.2d 909, 912 (1978) (ambiguous tax statutes granting exemptions and deductions strictly construed against taxpayer); see also Chickasaw Nation v. United States, 534 U.S. 84, 93-94, 122 S. Ct. 528, 535 (2001) (ambiguous statutes construed in favor of Indian nations). Here, the longstanding agency interpretation, followed by the confirming legislative history, shows that the canon of deference should be applied.
¶58 Although not necessary to the proper conclusion, the passage of Senate Bill 19 by the 2013 Legislature adds further impetus to accurately determining legislative intent. I find it significant that a bill was passed by both houses contemporaneously with the passage of Senate Bill 346, further defining the term at issue. The Court states the 2013 Legislature would have no reason to pass Senate Bill 19 if it had intended to adopt the 1993 rule within Senate Bill 346, because it would be redundant. However, the Legislature often uses multiple bills in a single session to deal with any given issue, and given that this litigation was pending, the 2013 Legislature’s double-knotting of the issue makes perfect sense.
*526 ¶59 For the Court to insist that the 1991 Legislature’s meaning of the term “combined appropriation” must be reinstated, regardless what occurred in the intervening years, restricts the power of the Legislature to subsequently amend the term, and grants a monopoly to the 1991 Legislature on this issue. This violates not only the canons of construction, but separation of powers. Further, legislative bodies cannot bind future legislative bodies in this way. Ohio Life Ins. & Trust Co. v. Debolt, 57 U.S. (16 How.) 416, 431, 14 L. Ed. 997, 1003 (1854) (“[N]o one legislature can, by its own act, disarm their successors of any of the powers or rights of sovereignty confided by the people to the legislative body, unless they are authorized to do so by the constitution under which they are elected.”); Newton v. Comm’rs, 100 U.S. 548, 559, 25 L. Ed. 710, 711 (1879).
¶60 It is really not difficult to determine what the Legislature intends here, even if it is difficult for the Court to accept. The DNRC’s two-decade-old administrative rule is a longstanding interpretation of a statute that is of “great importance” and should be given deference absent “compelling indications” that the interpretation is wrong. Because the 2013 Legislature clearly used the 1993 rule’s definition of “combined appropriation” when it revised the statute in 2013, there are no compelling indications the 1993 rule is wrong. Indeed, the 1993 rule has been affirmed by the Legislature. Under that rule, many permits have been issued over the past 23 years. Given the ambiguity in the statute and the DNRC’s longstanding interpretation, this Court generally defers to the agency. I would do so, and reverse.

 Section 5-11-205(2), MCA, provides that new parts of existing statutes are to be printed in a session law as italics, and deleted provisions are to be shown as stricken.